OPINION
{¶ 1} Plaintiffs-appellants John Schwarze, et al. appeal from the September 4, 2001, Judgment Entry of the Stark County Court of Common Pleas.
 STATEMENT OF THE FACTS AND CASE
{¶ 2} Defendants-appellees Ocean Edge and Ocean Reef, SRL are manufacturers of scuba diving equipment.
{¶ 3} During February of 1997, appellant John Schwarze (hereinafter "appellant") and his wife were staying at the Negril Beach Club in Jamaica. On February 11, 1997, appellant went scuba diving once for approximately 47 minutes. During his first dive the next day, on February 12, 1997, appellant, while at a depth of approximately 50 feet, "elected to try the other regulator, the other octopus, the second stage." Appellant's Deposition Transcript at 120[1]. The following testimony was adduced when appellant was asked during his deposition whether, in the absence of a malfunction, a diver uses the same regulator throughout his or her dive:
{¶ 4} A. Yes, that's true.
 {¶ 5} Q. Had something occurred with your primary regulator, such as a malfunction, causing you to remove it from our mouth?
{¶ 6} A. No.
 {¶ 7} Q. When you say for some reason you decided to take it out of your mouth and try the other regulator, what was your reason for doing that?
{¶ 8} A. It's something I do occasionally.
 {¶ 9} Q. All right. Can you give me a better explanation? Is there any reason in the world to do that?
{¶ 10} A. No.
{¶ 11} Q. You just felt like it?
 {¶ 12} A. I just decided just to swap regulators, and that's the reason.
 {¶ 13} Q. Okay. When you say that's something you do from time to time, how often had you done that before?
{¶ 14} A. One out of five times maybe.
 {¶ 15} Q. Did you ever record in your logbook that you were doing that?
{¶ 16} A. No.
 {¶ 17} Q. Is that something you learned in your training to do?
{¶ 18} A. No. That's not a mandatory recording.
 {¶ 19} Q. I'm wondering if it's even addressed as an optional thing to do?
{¶ 20} A. No. It's not something I record.
 {¶ 21} Q. Obviously I can't get into your head, sir, so I'm trying to have you explain to me what would make you do that one out of five dives.
 {¶ 22} A. Well, I expect, after having annual inspections, that they're fully functional octopus, or second stages. And occasionally, I'll just swap them for no other reason.
 {¶ 23} Q. For no reason other than that, they both work?
{¶ 24} A. Yeah.
{¶ 25} Appellant's Deposition Transcript at 120-122.
{¶ 26} After switching regulators 15 to 20 minutes into his dive, appellant "got a burst of air from the second stage [regulator] that was defective. It just shoved air and water into my mouth." Appellant's Deposition Transcript at 122. While appellant, prior to inserting the second stage regulator into his mouth, blew into it to clear the water and filled his lungs up with air, he did not press the purge valve, which tests the regulator by making sure that the seals and poppets are working. After coughing in order to get the water and air out of his lungs, appellant immediately switched back to his original regulator. Appellant, when questioned during his deposition, did not know which of his two regulators was the one that caused the problem. Appellant then completed his dive, which lasted between 8 and 13 more minutes after the above incident.
{¶ 27} When appellant returned to the boat after completing his dive on February 12, 1997, he noticed that he could not hear out of his left ear, which was plugged. Subsequently, later the same day, appellant went on another dive while using a different regulator borrowed from the Negril Scuba Center. The following days, on February 13th and 14th, 1997, appellant went scuba diving again using the equipment borrowed from the Negril Scuba Center. Appellant emerged from his February 13, 1997, dive numb, tingling, vomiting, and nauseous and had some difficulty walking.
{¶ 28} On February 14, 1997, appellant delivered both of his own regulators to John Larson, a dive master at the Negril Scuba Center. According to appellant, when Larson took apart one of the regulators, he found a broken poppet assembly, which is "part of the air flow device". Appellant's Deposition Transcript at 166. After replacing the broken equipment, Larson discarded the allegedly defective part. Appellant then used his own regulators during a morning dive on February 15, 1997.
{¶ 29} During the afternoon of February 15, 1997, appellant went to see a doctor, complaining of loss of hearing in his left ear. After examining appellant, the doctor prescribed Cortisone shots and pills. Appellant saw the doctor once more before returning home to Canton, Ohio, on February 18, 1997.
{¶ 30} Appellant and his wife, appellant Judith Schwarze, subsequently filed a product liability complaint in the Stark County Court of Common Pleas against appellees Ocean Edge and Ocean Reef SRL.[2]
Appellants, in their complaint, alleged, in part, that appellees were negligent in the design and manufacture of the regulators used by appellant during his February 12, 1997, dive. Appellees further alleged that defects in the regulators proximately caused appellant to suffer permanent hearing loss.
{¶ 31} On July 23, 2001, appellees filed both a Motion for Summary Judgment and a "Motion to Strike and Exclude the Expert Report and Opinions of Plaintiffs' Expert Preston Colby." Appellees, in the latter motion, argued that "Mr. Colby's expert report and opinions are not competent evidence pursuant to Rules 703 and 705 of the Ohio Rules of Evidence because they do not have a proper evidentiary basis and Mr. Colby's opinions are given without a reasonable degree of scientific certainty." On August 17, 2001, appellants filed memoranda in opposition to both motions.
{¶ 32} Thereafter, a hearing on appellees' Motion for Summary Judgment was held on August 21, 2001. As memorialized in Judgment Entry filed on September 4, 2001, the trial court granted appellees' motion to strike the deposition of Preston Colby, appellants' expert, "to the extent that it is based upon evidence which has been spoliated, and also, to the extent that his opinions are not based upon evidence which the Court may consider pursuant to Civil Rule 56." The trial court, in its entry, further sustained appellees' Motion for Summary Judgment.
{¶ 33} It is from the trial court's September 4, 2001, Judgment Entry that appellants now appeal, raising the following assignments of error:
 {¶ 34} 1. "THE TRIAL COURT ERRED AS A MATTER OF LAW ON THE SPOLIATION OF EVIDENCE ISSUE; ITS RULING EVISCERATED APPELLANT'S ENTIRE CASE."
 {¶ 35} 2. "NOTWITHSTANDING ITS RULING ON SPOLIATION OF EVIDENCE, THE TRIAL COURT ERRED IN PREMATURELY EXCLUDING APPELLANT'S EXPERT."
 {¶ 36} 3. "THE TRIAL COURT IMPERMISSIBLY GRANTED SUMMARY JUDGMENT HEREIN."
{¶ 37} As we find appellants' second and third assignments of error dispositive of the present appeal, we will address the above assignments of error out of sequence.
 II, III
{¶ 38} Appellants, in their second and third assignments of error, argue that the trial court erred in granting appellees' "Motion to Strike and Exclude the Expert Report and Opinions of Plaintiffs' Expert Preston Colby" and in granting appellees' Motion for Summary Judgment.
{¶ 39} As is stated above, the trial court, in its September 4, 2001, Judgment Entry, granted appellees' motion to strike the deposition of Preston Colby, appellants' expert, "to the extent that it is based upon evidence which has been spoliated, and also, to the extent that his opinions are not based upon evidence which the Court may consider pursuant to Civil Rule 56." The trial court, in its entry, specifically found that Preston Colby's opinion was inadmissable since the "facts upon which he presumably relies for his opinion fail to comply with Rules 703 and 705 of the Ohio Rules of Evidence."
{¶ 40} Evid.R. 703, which addresses the appropriate bases of an expert's opinion testimony, states as follows: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted into evidence at the hearing." Therefore, Evid.R. 703 does not prohibit an expert from rendering an opinion on materials outside the record. This is critical to a summary judgment motion affidavit as all the facts or data are not part of the record. Pursuant to Evid.R. 703, expert opinions may not be based upon opinions of other experts and may not be based upon hearsay evidence which has not been admitted. Azzano v. O'Malley-Clements (1998),126 Ohio App.3d 368, 374, 710 N.E.2d 373. "As long as evidence admissible at trial is introduced and admitted through fact witnesses with personal knowledge, an expert witness without personal knowledge of the underlying event is permitted to testify to an opinion based on admitted facts." Pennsylvania Lumbermens Ins. Corp. v. Landmark Elec.,Inc. (1996), 110 Ohio App.3d 732, 738, 675 N.E.2d 65. The Ohio Supreme Court, in State v. Chapin (1981), 67 Ohio 2d 437, 424 N.E.2d 317, addressed the admissibility of an expert opinion based on facts not in evidence. In Chapin, the Ohio Supreme Court specifically held as follows:
 {¶ 41} These facts present the issue of whether a psychiatrist, appearing as an expert witness, may testify about the contents of writings which he did not prepare but which aided him in formulating his opinion. In Ohio, the applicable rule is well settled. "In paragraph one of the syllabus of Burens v. Indus. Comm. (1955), 162 Ohio St. 549, 124 N.E.2d 724, this court stated: `The hypothesis upon which an expert witness is asked to state an opinion must be based upon facts within the witness' own personal knowledge or upon facts shown by other evidence.'" (Emphasis sic.) Kraner v. Coastal Tank Lines (1971), 26 Ohio St.2d 59, 60, 269 N.E.2d 43. See, also, Zelenka v. Indus. Comm. (1956), 165 Ohio St. 587, 138 N.E.2d 667; Drumm v. Blue Cross (1974), 40 Ohio App.2d 421, 429, 320 N.E.2d 713.
 {¶ 42} In this case, the report and records in question were not prepared by the four witnesses nor were these documents in evidence. The trial court, therefore, correctly sustained the objection. The Court of Appeals correctly affirmed.
{¶ 43} Id. at 442.
{¶ 44} In turn, Evid.R. 705, captioned "Disclosure of Facts or Data Underlying Expert Opinion, provides as follows:" The expert may testify in terms of opinion or inference and give his reasons therefor after disclosure of the underlying facts or data. The disclosure may be in response to a hypothetical question or otherwise."
{¶ 45} In the case sub judice, appellants' expert, Preston Colby, opined during his deposition that the free flow experienced by appellant during the February 12, 1997, dive was consistent with a damaged poppet assembly. However, Colby's opinion, that the equipment used by appellant on February 12, 1997, was defective, was not admissible. Colby never actually inspected the allegedly defective poppet assembly, which was discarded by John Larson after he repaired the same. Colby testified that his opinion that the poppet assembly was defective was based on a machine drawing prepared by John Larson and Larson's description in a letter to appellant detailing the defects in the regulator and the repairs that Larson made. As noted by the trial court in its entry, there is no evidence in the record that John Larson was ever deposed or that his credentials have been established[3]. Nor was an affidavit from Larson submitted to the trial court authenticating the machine drawing or the letter. Since the unauthenticated diagram prepared by John Larson and Larson's unauthenticated letter, were inadmissible hearsay and, therefore, are not based on "facts in evidence" within the meaning of Evid.R. 703, the trial court was correct in excluding Colby's opinion based on the same.
{¶ 46} We further find that the trial court did not err in granting appellees' "Motion to Strike and Exclude the Expert Report and Opinions of Plaintiffs' Expert Preston Colby" since the same were not made to a reasonable degree of scientific probability. Under Ohio law, an expert opinion is competent if it is held to a reasonable degree of scientific or medical certainty. State v. Jackson, 92 Ohio St.3d 436,448, 2001-Ohio-1266, 751 N.E.2d 946. "Reasonable certainty" is synonymous with the term "probability." Id.
{¶ 47} Preston Colby, during his deposition, testified that he believed that the initial poppet assembly that was sold to appellant with the regulator was defective, although Colby admitted that he had never seen the same. Colby found no fault with the actual exemplars of the poppet assemblies manufactured by appellees which were provided to him and which would fit into appellant's regulator. The following testimony was adduced when Colby was asked whether he knew exactly what equipment was involved in appellant's February 12, 1997, diving incident:
{¶ 48} A. That's correct.
 {¶ 49} Q. So it's possible that you are inspecting and testing and reporting on equipment that is not identical to the equipment that was involved in the alleged accident. Correct?
{¶ 50} A. Very, very, very probable.
 {¶ 51} Q. And would that not affect the validity of your report and your expert opinions in this case, again, through no fault of your own?
 {¶ 52} A. Yes and no. The report was based upon what I had. There's a lot of discovery left, and the report may change. Based upon what was provided to me, the exemplar, and the testing I did, I wrote a report.
 {¶ 53} I qualified it in the report that it's subject to further discovery. And I don't know — I never understood why you wanted to take my deposition until discovery was closed, because there are a lot of things that I'm going to need that's not answered yet.
 {¶ 54} Q. Mr. Colby, I'm going to tell you, even though I'm not required to do so, I'm waiting for someone to tell me what this case is about and I figured you would be the best possible person to do that.
 {¶ 55} So that I hope gives you some explanation as to why I want to take your deposition. Prior to today, nobody has been able to give me any education as to what equipment malfunctioned, what was wrong with it, et cetera. So please take that for what it's worth.
{¶ 56} A. Yes.
 {¶ 57} Q. Now, so what you're basically telling me is that your report may be inaccurate as it relates to the actual equipment that was involved in the subject dive. Correct?
 {¶ 58} A. I think there's abut a 99.9 percent probability that my report is going to change when we get exemplars of the equipment that was in the regulator at the time, because I don't believe we have it yet. (Emphasis added).
{¶ 59} Preston Colby's Deposition Transcript at 95-96. Colby further admitted during his deposition that he did not know what poppet assembly or seat was in appellant's regulator at the time of the diving incident and did not know whether the defective part was made of plastic, rubber, a polymer or some other type of product. Preston Colby's Deposition at 113, 120. When asked "what is the actual evidence of a product defect", Colby responded as follows: "John Larson's diagram and his description in the letter to John Schwarze." Id. at 115.
{¶ 60} Based on the foregoing, we find that the trial court did not abuse its discretion in granting appellees' "Motion to Strike and Exclude the Expert Report and Opinions of Plaintiffs' Expert Preston Colby" since such opinion was not given within a reasonable degree of scientific certainty, but rather was based on speculation, and since Colby's opinions lack an evidentiary basis.
{¶ 61} As is stated above, appellants, in their brief, further contend that the trial court erred in granting appellees' Motion for Summary Judgment on appellants' product liability claims.
{¶ 62} Summary judgment proceedings present the appellate court with the unique opportunity of reviewing the evidence in the same manner as the trial court. Smiddy v. The Wedding Party, Inc. (1987),30 Ohio St.3d 35, 36, 506 N.E.2d 212. Civ.R. 56(C) states in pertinent part:
 {¶ 63} Summary Judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law . . . A summary judgment shall not be rendered unless it appears from such evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor.
{¶ 64} Pursuant to the above rule, a trial court may not enter a summary judgment if it appears a material fact is genuinely disputed. The party moving for summary judgment bears the initial burden of informing the trial court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. The moving party may not make a conclusory assertion that the non-moving party has no evidence to prove its case. The moving party must specifically point to some evidence which demonstrates the non-moving party cannot support its claim. If the moving party satisfies this requirement, the burden shifts to the non-moving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. Vahila v. Hall 77 Ohio St.3d 421, 429, 1997-Ohio-259,674 N.E.2d 1164, citing Dresher v. Burt (1966), 75 Ohio St.3d 280,662 N.E.2d 264.
{¶ 65} It is based upon this standard we review appellant's third assignment of error.
{¶ 66} In Ohio, it is well settled that in order for a plaintiff to recover on a products liability claim, it must be proven by a preponderance of the evidence that: "* * * (1) There was, in fact, a defect in the product manufactured and sold by the defendant; (2) such defect existed at the time the product left the hands of the defendant; and (3) the defect was the direct and proximate cause of the plaintiff's injuries or loss." Shaw v. Toyotomi America, Inc
(1995),101 Ohio App.3d 54, 57, 654 N.E.2d 1337, citing State Auto. Mut. Ins. Co. v. ChryslerCorp. (1973), 36 Ohio St.2d 151, 304 N.E.2d 891, paragraph two of the syllabus.
{¶ 67} We concur with appellees that appellants have failed to establish that there was, in fact, a defect in the product manufactured and sold by appellees and that the defect was the proximate cause of appellant's injury. Based on our affirmance of the trial court's entry striking Preston Colby's opinion, there was no expert testimony in the case sub judice that the poppet assembly in the regulator used by appellant at the time of the February 12, 1997, dive was defective. Moreover, as noted by the trial court in its entry, since Larson's drawing and letter to appellant were never authenticated by affidavit or otherwise, neither were properly before the trial court for purposes of ruling on appellees' Motion for Summary Judgment. A trial court cannot grant summary judgment based on unsigned, uncertified and unauthenticated evidence. See Citizens Ins. Co. v. Burkes (1978), 56 Ohio App.2d 88,95-96, 381 N.E.2d 963.
{¶ 68} Furthermore, there is no evidence in the record that the allegedly defect poppet assembly caused appellant's hearing loss. We note that there were two medical records attached to appellants' Motion for Summary Judgment. Dr. Mark Meyer, in his report, stated as follows: he [appellant] sustained a barrow trauma injury two years later [in 1997] during a scuba diving accident which left him with permanent hearing loss on the left." Dr. Meyer, in his report, never indicated exactly what type of injury appellant suffered and exactly when appellant suffered the same. Dr. Alfred Magoline, in his report, stated as follows:
 {¶ 69} Mr. John Schwarze has requested that I forward a statement to you regarding the current status of the hearing in his left ear and possible etiologies of the hearing loss. As you are aware, Mr. Schwarze reports experiencing a sensation of fullness in his left ear accompanied by nausea while scuba diving in Jamaica on February 13, 1997. He reports experiencing no vertigo, popping of the ear or otalgia but complains of a continuous plugged sensation in his left ear following several dives. He initially felt that the fullness in his ear was secondary to water in the ear and treated the ear with alcohol rinses with no improvement in the plugged sensation. He was seen by a physician in Jamaica who treated him with antibiotics and decongestants followed by cortisone injections when the problem with his ear persisted. He then flew home to Miami and then on to Cleveland and had no exacerbation of his symptoms during the flight home. Mr. Schwarze was seen in our office on February 25, 1997 for evaluation of the fullness and plugged sensation in his left ear. At that time he reported bilateral tinnitus, left greater than right, as well as slight imbalance with walking but no vertigo.
 {¶ 70} Otologic examination on February 25, 1997 was within normal limits. However, audiologic evaluation demonstrated a left profound deafness with normal middle ear pressures by impedance testing. Mr. Schwarze was then treated with a systemic course of Prednisone as well as avoidance of strenuous activity. Serial audiogram demonstrated persistence of the left profound sensorineural hearing loss.
 {¶ 71} These findings are consistent with inner ear barotrauma related to middle ear clearing difficulties resulting in labyrinthine membrane rupture and subsequent sensorineural hearing loss. The prognosis for recovery of the hearing loss is extremely poor.
{¶ 72} Neither Dr. Meyer nor Dr. Magoline, in their reports, expressly opined that the allegedly defective poppet assembly was the proximate cause of appellant's hearing loss. As noted by the trial court in its opinion, such medical reports "do not provide any evidence as to the cause of Plaintiff's hearing loss." In contrast, Dr. Murray Grossan, appellees' expert, concluded in his report that the "free flowing regulator" was not the cause of appellant's hearing loss because:
 {¶ 73} A. Free flowing doesn't cause ear problems. Even if you forcibly could hold you [sic] breath, close your nose for enough time to build up a pressure, the pressure would still be too low. The eustachian tube is the opening from the nose to the ear. It is designed to keep mucus out of the ear when you swallow and sniff or blow your nose. However, If one forcibly blows his nose too hard, or tries to Valsalva too hard, that valve action can be overcome, but that would be a higher pressure than you could get from the regulator.*
 {¶ 74} B. He already had ear condition — probable Meniere's. He had major hearing loss in 88. Then right ear became worse. Probable cause was Meniere's disease. In such conditions the membranes are stretched. Diving would be contraindicated.
 {¶ 75} C. Hospitalized 2x for vertigo. Probably part of Meniere's. This is a contraindication to diving.
 {¶ 76} D. Pre dive had strokes or Lacunar infarcts. This means that the blood was think [sic] and clotted in a blood vessel. This showed on MRI and his toe numbness. Here too diving would bring on more vascular problems. You already have blood too thick. Pressure will thicken it further.
 {¶ 77} E. He had elevated BP and Cholesterol, both potential causes as well.
 {¶ 78} F. He complained of numbness after 2/13/97 dive. Was this part of a Lacunar infarct (stroke) that involved the ear as well? Reasonably it was because having had previous blood occlusion, adding the pressure of diving would make having additional vascular occlusion more likely.
 {¶ 79} f. Perhaps he valsalva excessively on 2/13/01. He says he had no trouble clearing. Dr. Mooney describes nasal dryness and irritation and this, plus the chemicals he was exposed to would be a causal factor for difficulty in clearing the ears.
 {¶ 80} g. Perilymph fistual — a hole in the inner ear that may involve the round or the oval window — is a common cause of hearing loss such as Mr. Schwarze developed. Unfortunately the records do not show that this likely cause of his hearing loss was not tested for.
{¶ 81} Based on the foregoing, we find that the trial court did not err in granting appellees' Motion for Summary Judgment since appellants have not presented sufficient evidence to create a genuine issue of material fact as to appellants' product liability claims.
{¶ 82} For the foregoing reasons, appellants' second and third assignments of error are, therefore, overruled.
 I
{¶ 83} Appellants, in their first assignment of error, argue that the trial court erred in ruling that appellants' failure to preserve the poppet assembly constituted "spoliation" of evidence and, as a sanction for the same, ordering that Preston Colby's deposition be excluded "with regard to Plaintiffs' claims of product defect under R.C.2307.71, with regard to Plaintiffs' claims of negligent manufacture only." According to appellants, such ruling "eviscerated Appellant's entire case."
{¶ 84} Based on this Court's disposition of appellants' second and third assignments of error, appellants' first assignment of error is moot.[4]
{¶ 85} Accordingly, the judgment of the Stark County Court of Common Pleas is affirmed.
By EDWARDS, J. FARMER, P.J. and WISE, J. concur
 JUDGMENT ENTRY
{¶ 86} For the reasons stated in the Memorandum-Opinion on file, the judgment of the Stark County Court of Common Pleas is affirmed. Costs to appellants.
[1] A copy of appellant John Schwarze's deposition transcript is attached to appellant's memorandum in opposition to appellee's Motion for Summary Judgment.
[2] While Diver's Supply also was named as a defendant in appellants' complaint, appellants voluntarily dismissed their claims against such defendant as memorialized in a Notice of Voluntary Dismissal filed on June 22, 2001.
[3] Appellants, in their brief, indicate that Larson will testify at trial.
[4] The trial court, in its Judgment Entry, noted that even if Colby's deposition was not excluded as a sanction with respect to appellants' product defect claims, appellants' claims based upon negligent manufacture would still fail as a matter of law.